Mr. Neal. If it pleases the Court, my name is Randy Neal, and I represent Melinda J. Wayne, who is here in the courtroom today. She's the appellate in this case. The appeal here has five issues. I know they're complex. I'd like to, because of the limited time, kind of take them a little bit out of order and start with those of highest priority to us. And I'm going to begin with the improper intrusion into her official personnel file, which is about the third issue that we raised. It's a Privacy Act system of records. In this case, a former supervisor went into the file and was looking for, well, we don't know why she went into the file. The judge even concedes that in his order. There are three different findings by the court in its order that we would certainly suggest would meet the standard that she did this intentionally. The supervisor went in and violated the Privacy Act intentionally. The judge, even after noting these three things. Is that the standard counsel is intentional? There's the four different things we need to show. It has to be intentional or willful. And then the additional things, of course, the violation of the Privacy Act system of records, and then that there was an adverse effect. The court found that even though these three things happened, that we had not shown that it was intentional. I'll say two things based on that. If we didn't show it was intentional, we certainly should have had the right to show it was intentional. We were denied discovery in this issue. So to say that we didn't show that it was intentional was based on the fact we never had access to the person, and the person never provided any kind of declarations or affidavits. You didn't take Ms. Henson's deposition? We certainly asked for them. And the record reflects back in, and this is excerpt number 56. I'm sorry? To file under Rule 56. Absolutely, Your Honor. We began the request for discovery back in February of 2005. We had a hearing because the court, the government, moved to say there was going to be no discovery until they had a chance at a summary, a motion for a summary judgment. During that case, and I'd like to cite the court to specifically pages 63 through 68 in the excerpts, there's a long discussion on why we weren't getting discovery and under what circumstances we would get discovery. In fact, we'd made 20 requests for depositions, including Ms. Henson, who was the individual involved here. We were denied that so the government could have its first shot at discovery. You were denied it permanently, or were you denied it until the government filed its motion for summary judgment? We were not denied it permanently, but the result was because of the way that the motion for dismissal, the summary judgment, was handled, we certainly were denied the chance to prove, make our case. In other words, Judge Hall, we want to show that this was an intentional infraction. In fact, the two cases that I think are most important here, I don't think even absent discovery and the deposition, we fail because under Covert v. Harrington and Albright v. United States, two cases that weren't cited in the briefs but certainly should have been, 732F2-181, it says that there's two ways here where it will be shown. A violation of the act, the Privacy Act, in a willful or intentional manner can be shown either by committing the act without grounds for believing it to be lawful or flagrantly disregarding others' rights under the act. The judge himself in the order cites to the government's own investigation that shows that there was no justification. In the words of Ms. Hinson when she was interviewed by the government, in an interview that we have no access to, once again, because of the court's order, she said she could not articulate the reason for going into the file. That is without grounds. That starts this slope of things that occur, this slippery slope of adverse effects. So what's the adverse effect? And that's cited, too, both in the complaint on page 6. The adverse effect is it triggers an IG investigation of your client's misrepresentations on her employment forms? It's actually an internal affair. The IG investigation was at Antonich. Absolutely. So what happens here is that these applications that were 10 years old that had nothing to do with her present job, she had just passed a background check. There was nothing to indicate any problems as far as her credibility or her going forward in her position as a law enforcement officer. That was a GS-9 position. After this investigator came on a simple complaint, Ms. Hinson then went to the investigator and says, we want you to broaden this based on what I saw in her OPF. If but for, and in fact there's a circular finding by the judge in his order saying, well, the investigator would have asked that anyway. That's just not in the record. The fact is the record is that except for Ms. Hinson saying, I found this in the OPF, he never would have asked that. And therefore, there wouldn't have been this basis. I'm not saying. And what you're making is a little bit of sort of a fruit of the poisonous tree kind of argument. Precisely. That is, there's no question that Ms. Hinson made some misrepresentations in her applications. Ms. Lane. I'm sorry, Ms. Lane. Ms. Lane. And if Ms. Hinson hadn't violated her Privacy Act rights by going and looking at the file, then nobody would have raised these questions and she might not have been terminated. That's absolutely correct. But, Judge Biby, there's more to it. I mean, these the question of whether she actually lied on these applications is really a question of fact that goes back 10 years to the time they were being made. She had over 200 hours. She had more credits in college than I did, and I have the degree. She was and the applications themselves allowed you to list the degree if you were going it was likely or you were going to complete that degree within a certain amount of time. That's all 10 years prior. At the time she applied for this job, at the time that she was filled out her background investigation, none of those issues were relevant. So what they did was, yeah, they absolutely bootstrapped on this was as the personnel officer himself at Lake Mead commented, this was a witch hunt. And it began with the intrusion into her OPF. Was there an adverse effect? She went from a GS-9 with a law enforcement career ahead of her. She went, she lost that. She's now, she started with a GS-4 position. She's trying to rebuild her career. There's an obvious loss of money. And it all begins with this first event, which is the subject of the investigation of the 7C request that we made. But before I go on to that, I'd like to talk, the second priority issue for us is. Before you do that, so counsel, what is it that you want us to do with respect to the Privacy Act claim? The Privacy Act, obviously the motion for summary dismissal should be reversed and remanded. I mean, obviously we need to talk about the intention, whether it was intentional. It's obvious that as far as adverse, the adverse effect that was pled. I mean, his comment, his finding in the order was that it was not. That's clearly erroneous. The words are there on page 6, page 11. It's just absolutely erroneous. And the oral arguments as well. At the time that they made the order, I don't know who prepared the draft, but he did not have a transcript of the oral arguments. That is now prepared. That's excerpts pages 190 to 191. Clearly erroneous. So it should be reversed and remanded. Obviously, there's not enough information on the record to make a summary judgment in our favor. We're not asking for that. But it needs to go back, and we need to be able to show that we need to depose Ms. Hinson. That would be the first start. And then also present the evidence that has to do with our effect. There was also a refusal to seal the records of the report of investigation that came out of this invasion of the privacy record, this official personnel file, OPF. That, to me, I'm not sure how that could be anything except for complete injustice here. Here the government is fighting desperately to keep the report of investigation of a high-ranking official who, of which there's a taped admission that he obviously, if not a criminal act, violated a policy of the department. And yet his report of investigation is highly redacted and kept under wraps because of his privacy rights, while in an effort to really, I think, plow the issue, her entire report of investigation against a low-ranking official. She was barely a rookie ranger. There's fewer ranks lower than where Ms. Lane was at the time in her career. And they propound that the reason they can do that is routine use to defend the litigation. It was totally unnecessary to defend this litigation. And the Use of Privacy Act basis for that, that the Department of Justice had promulgated a regulation which allowed them to disclose this particular report of investigation. This report of investigation and her background check included information on her parents, their phone numbers, their dates of birth,  totally unredacted. It was placed in under that regulation. Now, in Covert v. Harrington, in this circuit, the court held that an agency cannot promulgate regulations which ignore the dictates of the Privacy Act. And that's exactly what happened here. And we're not even asking that the court not consider those matters. All we asked is that Ms. Lane's privacy be protected by sealing those records. On this question, you're just asking that we seal district court records. This is not a damage request. Absolutely. All we're saying is it was error to rely upon the regulation of the agency. That's in direct contradiction to Covert v. Harrington. That was the exact same regulation that Covert Harrington was addressing, v. Harrington was addressing. In what context could those records be accessed today? Access, they should be accessed, if they're under seal, the court can address them the way that there's a But if they're not under seal, who can get access to her records today? It's an open record. It's an open court record. I could go down there at eight cents a page and get on PACER. I mean, it's an open court proceeding. I don't know how the court clerk could refuse. Now, the third issue, which I think is a little bit meatier, and I also think that the courts, I know Judge Schroeder has quite a bit of experience after the Hunt decision in the 7C issue. Again, there's several citations to Kimmerlin and Hunt and these kind of cases. Obviously distinguishable, those are cases that deal with low-ranking officials. I think what is clearly error by the court in this case is that he says, well, there's no evidence. And there's a lot of reliance on Favish. Favish had to do with these grisly pictures, which are well beyond what had already been released in that case. No one is saying that the other portions of the investigation into Vince Foster's suicide shouldn't have been released. I mean, the case in Favish was well beyond simply the conclusions of the investigations. Those had been released. Well, we have this duty now under Favish that we as citizens have to come up to the government and somehow have previously investigated the investigation and provided some kind of evidence. Well, I think in this case there's two problems. A, we already did provide evidence. It's compelling evidence to have a recorded admission of a high-ranking official admitting to the very wrongdoing. And in a context that can't be mistaken, there was no logical justification for telling the story that he told. So there is evidence. They find throughout, well, there's no evidence, there's no evidence. That's just simply untrue. Perhaps the investigation found no corroboration. But there's certainly evidence that would make a reasonable person listening to that tape say, wow, there was some impropriety there. Holding a gun to the back of a suspect's head with a black hood over his head, that's impropriety. And to have the actual person admitting to it is clear evidence. Now, there may be ‑‑ So what is it that you're asking us to do here, counsel? Under the 7C, well, there was a grant of ‑‑ there was a cross motion for summary judgments. You're trying to get the ‑‑ this would be the OIG's investigations released? Absolutely. Released to you? Released publicly. There's no distinction under FOIA. Right. You can't just release it to me. It's going to the public regardless. So, yes, absolutely. This one is so clear in error that it should be released, period. The court could simply overrule, reverse an order. But if it found there was still some more information ‑‑ Did you get these redacted in redacted form? We absolutely did. And those are actually contained in the excerpts. So you just want them in the unredacted form? Well, I think, you know, Judge Bybee, you're right. There's going to have to be further proceedings at the district level. We couldn't just order it from this level because ‑‑ And what's the purpose in having these come out? Because there may ‑‑ well, the reason I say there are some redactions that may be appropriate. But we see entire conclusions, attachments, nearly entire pages. And those are all in the excerpts number ‑‑ I'm sorry, excerpt four. But the reason, absolutely, this is a person who was basically whistleblowing. She was sitting in a meeting. She just happened to have a tape recorder because of what was going on. She was concerned about, you know, people coming up and denying things or saying things didn't happen or things were said that weren't said. She has the tape. She gets the tape. And she certainly didn't expect for the chief ranger of Lake Mead to be telling this kind of a story. It came out of the blue. She wasn't even sure what to do with it. And then there was all these efforts to try to get that tape destroyed. That in itself is cooperation. If he made all this stuff up and it's no big deal, why would he care? And if there was just no way that anybody could ever believe it, why would he care? Obviously, this is something that was very damaging to him. But the only reason the court said, I mean, as the way, yeah, the public interest in knowing whether or not this occurred, the public interest in knowing whether the investigation was adequate, which is the standard here, is that there's a privacy interest for the individuals involved. And they quote Bast, Bast versus DOJ for that. Let me tell you what they didn't quote. They quote, of course, that people have an expectation not to be associated with this kind of misdeeds, this kind of investigation. But here it says the very last thing. Nevertheless, disclosure of information remains an important consideration under Exemption 7C. It cannot be outweighed on a per se basis by a privacy, any privacy interest. Now, where is a declaration? Where is an affidavit? Where is anything in the record that suggests that anybody has asserted their privacy interest, let alone the court's and the government's reliance on the privacy interest of individuals who were simply interviewed as part of this investigation? Now, the last thing I want to say about this investigation, I mean, who really gets, the court says, and I think most in opposite to the very essence of the FOIA, the court says we don't need to look any more into whether or not this story was true, because the government looked into, and this is on page 214 of the excerpts, page 12 of the order, there is no public interest in determining the veracity of Antonich's story because the government has already done so. Nothing could be more in opposite to the Freedom of Information Act. The question here, who should decide whether an investigation was adequate? There's three possibilities. Is it the public? Is it the courts? Or is it the government itself? I certainly hope that the court would not agree with this order that says the government itself decides. I'm certainly, I certainly don't believe Favish says that we have to, we have to take the government at its word. Well, then we have these in-camera views. Is that a chance for the courts to usurp what should be a public, you know, the ability of the public to know what the government is up to? And was it clear that the court did view in camera all of those documents? No, it's nowhere in the record whatsoever that he looked at the, which was Exhibit 40 that was presented as part of the exhibits in support of the government's motion. Nowhere in the record does he reveal he ever looked at the unredacted record. That's absolutely right, Judge Hall. And that's, again, another question. I mean, this was a per se, this was a per se determination based on a record that had no discovery. Now, if we have a new duty under Favish, which certainly the court seems to suggest, that somehow under Favish we have to bring evidence, a person, a public, just an individual off the street has to bring evidence. The idea that we, as the general rule, have no discovery would make it an impossible standard. Okay, now, just very briefly, the reason that you want these documents is what? Well, I think it's a public, it's a, the interest is the public's interest. This is a high-ranking official who admits to basically torturing a prisoner. That is something that has a public interest, but Ms. Lane is the one who brought that matter to the forefront, whose disclosure went to the Office of Inspector General. But the OIG then concludes that the guy was clearly making it all up. I don't know. If the court has seen that redacted, the unredacted version, Judge Bybee, you can say that. I can't say that. I haven't seen it. But all I've seen is what other individuals looking at the report have said, and their conclusion was that there was no evidence to corroborate, not that there was no evidence that it was true. And we don't know how they investigated. You know, if Tony Soprano was bugged by the FBI and he says, yeah, I whacked a banker in Trenton five years ago, and the rest of the henchmen all laugh, how would you investigate that if you were the FBI? Would you go ask Tony, is that true? Of course he's going to deny it. Would you go to the henchmen and say, well, did you believe that story when Tony told it? Oh, no, we thought it was all a big joke. Is that the investigation here? This court could know because the unredacted version is under seal. The public can't know. We don't have a copy of the investigation. All right. You've used your time. We'll give you a minute on rebuttal. Thank you. Thank you. Good morning, Your Honor. Mark Wanker on behalf of the appellee, United States. Why don't you give us the big picture here? The big picture here is it's a personnel dispute. And Ms. Lane is trying to circumvent the procedures under the Civil Services Reform Act, or what she should have pursued under that, with regard to alleged discipline she received as a result of alleged whistleblowing. They're trying to go through the back door, through FOIA and the Privacy Act, and achieve whatever remedy they can through that. A couple of things I first want to point out with regard to Mr. Neal's presentation. The first issue was Ms. Hinson's review of Ms. Lane's OPF. The district court did not find that that review was willful or intentional. On the excerpted record, page 218, the district court said there was no showing of willful or intentional conduct. How could it be other than willful? It could have been an innocent mistake. She didn't know what the regulations were. And what led up to this whole process is why would knowing the regulations excuse her looking at somebody else's personnel file if she's not the HR officer or the office supervisor? Your Honor, it doesn't excuse it, but it doesn't rise to the level of willful or intentional conduct which is required for civil remedies. And so you're saying that in order to be willful here, there would have to be sort of a conscious violation, in other words, almost specific intent. Something like specific intent or she was doing it specifically because of retribution. Because of the big picture theory here is Ms. Lane attended a hearing with Chief Ranger Antonich where he made these statements about putting a hood over somebody at Death Valley and that was investigated and so on and so forth. And Ms. Lane, actually her attorney in November of 2002 sent a letter to the Department of Justice, the Attorney General, comparing that act to the Louima torture in New York City. Now, what's interesting, that's what initiated the investigation of that statement. But what happened before that is Ms. Lane was disciplined because of her actions with regard to one traffic stop. She was disciplined because of what she went through training to obtain her law enforcement commission at the FLETC, the Federal Law Enforcement Training Center. As part of her evaluation of the presenters, she used profanity. She was disciplined because of that. There was a second complaint about a traffic stop that was presented to the National Park Service. Those incidents are what gave rise to the ultimate investigation into Ms. Lane and whether she was qualified to maintain a law enforcement commission. Ms. Henson apparently did review her OPF. She shouldn't have done it, but it was a result of what was going on with these other incidents. Mr. ---- Your response then is she may have violated the act and even if it was willful, there's still no adverse consequence because there were a whole bunch of other things going on that required discipline of Ms. Lane. That's correct. But with regard to the OPF, she also needs to show actual damages in addition to the willful conduct and adverse effect. Did the fact that Ms. Lane had misrepresented her college degree on her applications play any role in disciplining her or deciding to terminate her? She voluntarily left. Did it play any role in the discipline? To my knowledge, no, because I believe she left the employment of the National Park Service. Would she have known about the letter from the U.S. Attorney saying that she had been so compromised that they couldn't bring any prosecutions in which she would be a witness? That happened, I believe, before she left the National Park Service. Is there any evidence that she knew about that letter? I would assume she knew about it, but I don't know, Your Honor. Now, but going back to Mr. Neal said that he and Ms. Lane were prevented from conducting discovery to prove willful intent or actual damages or an adverse effect. That's not quite correct. When the hearing, when there was a hearing before the district court about discovery and the district court ultimately stayed discovery, the district court made it clear, the district judge stated that he would allow discovery if it was needed to respond to the government's forthcoming motion for summary judgment, and that's reflected on the excerpts of record page 69 at the bottom of the page. The government filed its motion for summary judgment. There was no motion under 56F from Ms. Lane stating that I need to conduct this limited amount of discovery to properly respond to the motion for summary judgment. So that option was out there, but Ms. Lane did not pursue it. With regard to, well, with regard to Ms. Hinson viewing the OPF, because there was no evidence presented of willful conduct, no evidence of actual damages, and no evidence of an adverse effect, summary judgment dismissing that claim should be affirmed. The first claim is under FOIA, and that deals with Ms. Lane's attempt to get a copy of the investigation of Chief Ranger Antonich, dealing with his statements about the Black Hood and all that. A redacted copy was provided. The district court, in deciding whether or not the government needed to produce an unredacted copy, went into extensive factual findings of the various interests involved. And here the court needed to weigh, on the one hand, the privacy interests of people like Chief Ranger Antonich, the investigator himself, the people who were interviewed as part of the investigation, versus the public's right to know. Generally under FOIA, there is a presumption that the government, or the public has a right to know what the government does. But when we're dealing with the exemptions that the government has asserted and the OIG asserted in redacting, those are exemptions 6 and 7C of the FOIA. And both of those exemptions talk about unwarranted invasions of privacy. And that term necessarily involves a weighing of privacy interest versus public interest. Well, there's a problem, too, which they've raised. And there's a very high standard, a very high burden put on the individual to show somehow the government is not investigating properly, which is raised in Favish. It seems to me almost impossible to meet that standard. How does the individual go along meeting the standard that they are aware that there's a non- inappropriate review of this matter? The government is not acting well. I'm confused, Your Honor. Is it you mean what does the requestor need to establish, or what does the government need to demonstrate in order to show that she has a right to these documents in spite of the 7C exception? She's got to have a reasonable belief that the government impropriety has occurred. How does she acquire that? How do you meet that standard? Well, under the Favish decision, Your Honor, the Supreme Court stated that if the intent of the requestor is to demonstrate that a government official acted improperly, and that's the argument here. Either it's to show that Chief Ranger Antonich acted improperly or OIG improperly investigated that allegation. But once that's established, that's the intent of the requestor, then the Supreme Court stated that there has to be something more than a bare suspicion of impropriety, and the requestor was. There's a presumption that the government's acting legitimately. So you're facing that presumption. I just seem to be a very difficult standard for the individual to come up and say, you know, the government is not operating legitimately, but I can't get at any information so that I can really show this to the degree I can overcome the 7C exemption. How does the individual go about doing that? Own investigation. She was an employee. She had knowledge of what was said at the meeting. But she doesn't have any knowledge of what is going on in this investigation, and she can't get any of the papers. Right. And that's, I don't know if it's a conundrum, but that's the balancing test that is set forth in 7C. The privacy interest of those that are being investigated, being interviewed and whatnot versus the public's right to know. And the district court weighed all those interests and made extensive findings. On the excerpts of records, pages 212 through 214, the district court judge made three pages of factual findings on the privacy interest at stake versus the public interest that's at stake. And the district court came to the conclusion the privacy interest outweighed the public interest because it was primarily a factual finding. It's subject to a clearly erroneous standard of review here. There is sufficient evidence to support the district court judge's granting of summary judgment to the government. Did the district court review these documents in camera? No. But there is no requirement for him to do so. I'm just wondering how he weighs and balances if he doesn't know what's in those documents. Right. He did not. My understanding is the judge did not review them in camera. However, this was, the judge relied on factual determinations in dismissing the FOIA claim, and therefore it's the clearly erroneous standard, and we submit that there is sufficient evidence, more than sufficient evidence, to support the dismissal. Was there any, how did the district judge know what happened in the investigation? Was there testimony or anything else since he didn't review these documents? How did he know there was a legitimate investigation going on? I mean, the district claimed that there wasn't an appropriate investigation. It was just a whitewash. It wasn't a good investigation. I believe that conclusion is contained in the unredacted version of the OIG investigation. Did he review that? Well, the redacted, or I'm sorry, I'm sorry. I meant the redacted version, the redacted version. And the redacted version was submitted to the Court and is part of the record. I didn't have a look at the redacted version. The second claim asserted under the Privacy Act deals with Ms. Lane's request to get a copy of her Board of Inquiry file. And that deals with the misstatements in her various employment applications which led to the hearing on her law enforcement commission. The government provided a highly detailed declaration of Holly Bundock, and that's in the excerpts of record, pages 94 to 102. Now, are we still talking about FOIA? Are we on the Privacy Act? This now is the Privacy Act. Didn't she get everything she wanted under the Privacy Act? Eventually. Eventually. She got everything. Yes. And the government has to do a reasonable search to try and the declaration in the excerpts of record shows that the government did an extremely thorough  Ms. Lane complains that some of the information was improperly redacted, and there were redactions in the 577 pages of documents responsive to the Board of Inquiry file. However, under the Privacy Act, subsection D1, a requestor such as Ms. Lane is only entitled to documents pertaining to herself. Within all these files, they reference other people's personal information about them and whatnot, primarily National Park Service employees, so confidential information about them, was redacted. The government's position is it's done everything it possibly can do to look for these records. There were multiple requests made both under the FOIA and the Privacy Act from both Ms. Lane and from her attorneys to various government offices, agencies, and departments, and the affidavit of Holly Bundock goes into great detail the steps the government took to try and locate any documents that would have been responsive to the request for her Board of Inquiry file. Now, with regard to the sealing of a portion of that file, Ms. Lane filed a motion to seal, one, notifications and requests for personnel action dealing with her, and that's in the Clerk's Record 28, Exhibit 1. And she also asked to seal the specific investigation about her false statements about her educational background, and that's in Exhibit 36, pages 272 to the end. Those documents were presented to the U.S. Attorney's Office as a result of the complaint that was filed and her request under the Privacy Act. Under the regulations cited in the United States response to the motion to seal, we set forth the regulations that allow the Department of Justice to disclose documents it obtains in the course of litigation. That's what happened here. That's why they became part of the record, and that's why they are considered what's called a routine use under the Privacy Act. So by bringing the suit, she sort of forfeits her rights to keep those things private? Yes, Your Honor. Yes. She was the one that instigated it. Now, as compared to the first flush, it doesn't make sense. But under the FOIA, she's trying to get records of ostensibly innocent bystanders, and that's why they're entitled to have their records not sealed but at least redacted. And with regard to the sealing of or these documents dealing with the Board of Inquiry file, her own personal information was redacted from that. In conclusion, Your Honor, there was sufficient evidence to grant summary judgment on the one FOIA claim and the two Privacy Act claims. The district court didn't abuse its discretion in staying discovery pending the motion for summary judgment. The district court kept the door open and allowed Ms. Lane to seek discovery if it was needed to respond to the motion for summary judgment. That invitation was not accepted. And under so that's 56. Let me understand. I wasn't quite sure what happened under 56F. There was a 56F submission saying that they needed discovery or No. My understanding, there was never, that never occurred. There was a hearing discussing procedural issues including discovery and a forthcoming motion for summary judgment. And that's where the district court stayed discovery and set a deadline for the government to file its motion and told Ms. Lane that she could conduct discovery if it was needed to respond to the forthcoming motion. And you're saying that there was never an adequate showing that she needed the discovery in order to respond to the motion for summary judgment? Correct, Your Honor. Thank you. Let me ask one more question. In the records that were not sealed, could she have asked that personal information about her parents, for example, be redacted from those records? If for nothing else, I think she probably could have, but my understanding is they were filed as part of an exhibit and some information was not redacted I think the United States redacted all that information and substituted that exhibit. My understanding, that information that's with the clerk's file has now been redacted. I think it was substituted out. Thank you. Thank you. Do you wish to add anything? Should we give you a minute? Your Honor, there's just some factual issues that Mr. Wanker substituted in. The original AUSA was Mr. Hare, and so I don't blame him. I'm sure that there's no intention here to misrepresent the record. First of all, there was no discipline. There was no discipline of Ms. Lane during any of this process. In fact, it's very clear that even the Board of Inquiry is not a disciplinary process. None of that occurred. There was no discipline for any traffic stops. There was no discipline for these other things. That didn't happen. Second of all, Then why did she leave? Well, when she had her commission lifted, then she Her what lifted? Her commission to perform law enforcement duties, it substantially changed the way that she was going to be working. She wouldn't be in law enforcement anymore. Is that a disciplinary action? You know, that's a great question, and the government has gone to great pains to make sure that it's not a disciplinary action because, as the AUSA has said before, yeah, there's a civil service response to having a disciplinary action. I can take this all the way This is kind of a catch-22 here. This is not a civil service action specifically, so it can't be reviewed. And they've gone to great pains to make sure that it's not. The other issue is You've gone to great pains to make sure that this is a FOIA case and not some other kind of a case or a challenge to a disciplinary action, it seems to me. I just think this is very strange. I understand your point, Judge, but the issue really here first is she blew the whistle on this guy, and now she's paying the price for it, regardless of whether she gets her career back. I mean, that's really not the point. She's not going back to work for the National Park Service as a ranger. That's not going to happen. At this point, all she wants to say is, how did my report of investigation become something that was open and public, and this guy, his privacy interests, you know, somehow overruled that? The one last thing, Your Honor, if I can just quickly address this. I would ask that the Court be just referred to pages 64 through 68 of the telephone. Now, part of the problem is Mr. Hare was representing the government at that time, but it's very clear from the language from the judge that if there was any dispute at all, he was not going to grant summary judgment. And it was certainly my understanding, having actually participated in the conversation, that the summary judgment went first without discovery, not look at the summary judgment motion and then we decide whether there's discovery or not. So you think that you were prevented from conducting depositions of Ms. Henson? There is no question in my mind, 100 percent. And it's right here. It says, that might be subject to any investigation or dispute. I can't see how I'm going to be able to grant summary judgment on it. And he reports that. Wait. I'm sorry. Whose motion for summary judgment is before the Court at that point? There is no motion for summary judgment. This issue, which is, again, the discovery hearing is excerpt number 5. The only issue is discovery. We asked for discovery. We went through the process. We notified counsel. We had the – he said, no, you're not getting any of those. We had the conference. And then we brought the matter before the judge. All the rules were followed. During that conference call, they said, we are going to file a motion for summary judgment, but no motion had ever been put before the Court. This was perspective. The judge – at the point that the judge was making the decision on discovery, they hadn't even made a motion for summary judgment. Did the Court subsequently grant summary judgment to the government? Absolutely. There was a motion filed, wasn't there? Exactly. And at that point, did you request additional discovery, discovery of Henson? The – my understanding of what we – what our rights was, and the Court can read through this, and I think the transcript is clear for itself, is that I had – 64 to 68? Correct. I had no rights to discovery until the motion was heard. And that's – you know, because there's guarantee after guarantee here. It's paragraph after paragraph. You know, if you don't – if this isn't something that doesn't require discovery, then Mr. Neal is going to need his discovery. Why are you reading from – why are you referring to paragraph after paragraph? This is the transcript. I have the – this was a telephonic hearing on discovery, the discovery question. And that's – that's in the excerpts of record. And, you know, my understanding – and, you know, maybe I'm limited by my legal education, but the – my understanding is we had no chance at discovery until after the motion was ruled upon, and that if there was a need for discovery, the motion was going to be denied. And he says that at least four or five times in the – in one or two minutes. I'm going to have to – if there's any reasonable dispute as to inferences and Is this an argument – is this an argument on the motion for summary judgment, or is this an argument before? This is the argument on discovery. And you – And the government then subsequently files a motion for summary judgment. Right. And then did you request at that point, say, Judge, I can't – I can't defend this without conducting a deposition of missing – But Rule 56 – Well, sure. That was our response. Absolutely. After the motion was filed. Yes. Our motion is – absolutely. Throughout the motion for summary judgment, our response is, Judge, you didn't give us discovery. Now you're asking us to respond to a motion that we don't have discovery for. You were asking for the same discovery that you were arguing about before. Absolutely. Which are the documents that are the subject of the – Oh, no, Your Honor. We were asking for depositions. We were asking for the right to talk to the people who were involved. You know, any type of discovery would have been acceptable to us. We – you know, one of the things that we would have definitely gotten through discovery is the interview of Mary Hinson through the interviewer, who's talking about why she went into the OPF. Obviously, that would have been discoverable. Okay. So that whole issue is part and parcel in our response to the motion for summary judgment. Absolutely. We said we're – This is a FOIA request. That's on – It's the Privacy Act. Privacy Act and the FOIA Act. Plus, he found on a Privacy Act issue where there was a file that is even referenced by the government that this complaint that she had at FLETC, which we've never seen, and the government says, oh, we can't find. I mean, that's certainly something that we should have been able to ask somebody about. We were denied discovery, and that was – that was my understanding based on the ruling made on a discovery motion and that the government was going to have its opportunity to do the motion for summary judgment. All right. Thank you. We've given you more time than the Exxon Valdez. Thank you. The matter just argued is submitted for decision. That concludes the Court's calendar for this morning.
judges: Schroeder, Hall, Bybee